# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 20-5580

J<small>ACK</small> L. S<small>TOVER</small>, A<small>PPELLANT</small>,

V.

D<small>ENIS</small> M<small>C</small>D<small>ONOUGH</small>,
S<small>ECRETARY OF</small> V<small>ETERANS</small> A<small>FFAIRS</small>, A<small>PPELLEE</small>.

On Appeal from the Board of Veterans' Appeals

(Argued April 5, 2022)                                          Decided July 11, 2022)

*Zachary M. Stolz*, with whom *David J. Giza* was on the brief, both of Providence, Rhode Island, for the appellant.

*Mark D. Vichich*, with whom *Richard A. Sauber*, General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Megan C. Kral*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before GREENBERG, ALLEN, and MEREDITH, *Judges*.

ALLEN, *Judge*, filed the opinion of the Court. GREENBERG, *Judge*, filed a concurring opinion.

ALLEN, *Judge*: This appeal concerns an issue that recurs with some frequency before the Court: How should we review VA's adjudication of veterans' claims alleging exposure to herbicide agents while serving in Thailand during the Vietnam War Era? For veterans, proving exposure to herbicides is often difficult because a veteran usually has no evidence to establish the fact of exposure. Unlike for veterans who served in the Republic of Vietnam itself, Congress has not acted to ease the burden veterans who served in Thailand carry to establish herbicide exposure. [1] However, VA has acted in this area by adopting a provision in the Agency's *Adjudication Procedures Manual* (M21-1) that speaks to the Thailand herbicide exposure question. [2] This appeal

---

[1] Congress established that a veteran who "served in the Republic of Vietnam during the period beginning on January 9, 1962, and ending on May 7, 1975, shall be presumed to have been exposed during such service to an herbicide agent." 38 U.S.C. § 1116(f).

[2] M21-1, pt. VIII, subpt. i, ch. 1, § A.4.a, b. This citation refers to the location of the Thailand provision in the recently reorganized M21-1. Throughout the parties' filings, they cite the Thailand provision as being located at M21-1, pt. IV, subpt. ii, ch. 1, § H.4.a, b, where it was located before the reorganization. The substance of the provision has not

calls on us to address how VA has applied its Thailand herbicide exposure guidance, at least with respect to the resolution of the claim before us today.

Appellant Jack L. Stover served honorably in the United States Air Force from December 1966 to December 1970, including service in Thailand at the Takhli Royal Thai Air Force Base (RTAFB).[3] In this appeal, which is timely and over which the Court has jurisdiction,[4] he challenges a June 10, 2020, decision of the Board of Veterans' Appeals that denied entitlement to service connection for diabetes mellitus, including based on herbicide exposure during his service in Thailand.[5]

This matter was referred to a panel of the Court principally to consider the operation of the M21-1 provision concerning herbicide exposure for veterans who served in Thailand.[6] Specifically, we are asked to address how the Board defined the phrase "on or near the perimeter[]" as it relates to a veteran's service at an RTAFB. As we will explain, the M21-1 provision provides that, under certain circumstances, veterans who establish that they served "on or near the perimeter[]" of an RTAFB may show, through performance of their duties, that they were exposed to herbicides.[7] While the M21-1 provision does not provide a true *presumption* of exposure, the provision eases the burden of proving exposure, which is highly significant to a claimant.

We hold that the Board adopted the M21-1's provision for establishing exposure to herbicides in Thailand as the rule of decision for appellant's claim. Next, we conclude that the Board erred by failing to explain what it understood "near the perimeter[]" to mean when it denied appellant's claim in large measure because appellant had not established that his duties regularly placed him "near the perimeter[]" of the Takhli RTAFB. Because the Board's approach to this issue put appellant in the untenable position of not knowing what he needed to prove to satisfy the rule

---

changed since VA originally added it in 2013. Throughout this decision we will cite the current location of the Thailand provision, M21-1, pt. VIII, subpt. i, ch. 1, § A.4.a, b.

[3] Record (R.) at 867, 959, 1080.

[4] *See* 38 U.S.C. §§ 7252(a), 7266(a).

[5] Though the "Order" section of the Board's decision merely describes the condition on appeal as diabetes mellitus, the body of the decision makes clear that the condition at issue is diabetes mellitus, *type II*. R. at 8. The Board also remanded a claim for service connection for a bilateral leg rash. The Court lacks jurisdiction over this remanded matter. *See Breeden v. Principi*, 17 Vet. App. 475, 478 (2004) (per curiam order).

[6] M21-1, pt. VIII, subpt. i, ch. 1, § A.4.a.

[7] *Id.*

2

of decision the Board adopted, we will set aside the Board's June 2020 decision and remand this matter for further proceedings consistent with this decision.

## I. HISTORY OF HERBICIDE EXPOSURE IN THAILAND

As we discuss in detail below, we conclude that the Board adopted the relevant M21-1 provision concerning Thailand herbicide exposure as the rule of decision in appellant's case. Given that conclusion, it is important to understand how VA came to include that provision in the M21-1 in the first place. So, we begin by briefly discussing a history of how the military and then VA addressed the Thailand herbicide exposure question.

In the early 1970s, the Air Force conducted a study of base defense practices at RTAFBs leading to a February 1973 document entitled the "Contemporary Historical Examination of Current Operations Report" (CHECO Report). The CHECO Report reflected that base-perimeter security was a concern for these bases because fences "don't stop determined sapper squads."[8] Thus, bases used various combinations of other tactics to observe and secure base perimeters, and Major Benjamin H. Barnette, Jr., an author of the CHECO Report, acknowledged that "[t]o further aid in observation, herbicides were employed to assist in the difficult task of vegetation control. Use of these agents was limited by such factors as the [rules of engagement] and supply problems."[9] The report went on to illustrate "[t]he extent to which vegetation has been cleared" with a map of the Nakhon Phanom RTAFB showing "vegetation inside the base perimeters in the early days of construction when the airfield was carved out of virgin jungle" and comparing the RTAFB in 1966 with the RTAFB in 1972.[10] The CHECO Report was originally classified, but at some point, it was declassified and came into VA's possession.[11]

In May 2010, VA's Compensation and Pension (C&P) Service[12] released a bulletin in which it conceded that "there was significant use of herbicides on the fenced[-]in perimeters of

---

[8] R. at 48-49.

[9] R. at 49.

[10] R. at 50.

[11] R. at 30, 48. It is not clear precisely when VA received the declassified version of the CHECO Report. However, the exact date when VA received it is not relevant to our discussion.

[12] Since 2010, VA has separated what was then the C&P Service into two distinct administrative units, the Compensation Service and the Pension and Fiduciary Service. *See Barry v. McDonough*, 35 Vet.App. 111, 126 n.66

military bases in Thailand intended to eliminate vegetation and ground cover for base security purposes."[13] The bulletin specifically cited the CHECO Report to support the Agency's conclusion about herbicide use in Thailand.[14] The C&P Service then stated that it had "determined that a special consideration of herbicide exposure on a facts found or direct basis should be extended to those Veterans whose duties placed them on or near the perimeters of Thailand military bases."[15] In articulating to whom this special consideration applied, the C&P Service noted that "[t]he majority of troops in Thailand during the Vietnam era were stationed at [RTAFBs] of U-Tapao, Ubon, Nakhon Phanom, Udorn, Takhli, Korat, and Don Muang."[16] And then the C&P Service concluded that

> [i]f a U[.]S[.] Air Force Veteran served on one of these air bases as a security policeman, security patrol dog handler, member of a security police squadron, or otherwise served near the air base perimeter, as shown by MOS (military occupational specialty), performance evaluations, or other credible evidence, then herbicide exposure should be acknowledged on a facts found or direct basis.[17]

In May 2013, VA incorporated this C&P Service Bulletin directive into the M21-1.[18] Today, the M21-1 states: "Compensation Service has determined that a special consideration of herbicide exposure on a factual basis should be extended to Veterans whose duties placed them on or near the perimeters of Thailand military bases."[19] The M21-1 goes on to provide steps for "[w]hen a Veteran with service in Thailand during the Vietnam era claims [service connection] for disability based on herbicide exposure."[20] The M21-1 includes a table listing the RTAFBs to which

---

(2022); *see also* DEP'T OF VETERANS AFFAIRS, 2020 FUNCTIONAL ORGANIZATION MANUAL, at 20 (May 15, 2020), https://www.va.gov/VA-Functional-Organization-Manual-2020-4.pdf (last visited June 24, 2022).

[13] R. at 30. The original language of the bulletin was found in VA Fast Letter 09-20, which pertained to cases stayed as part of the litigation in *Haas v. Peake*, 525 F.3d 1168 (Fed. Cir. 2008), *overruled by Procopio v. Wilkie*, 913 F.3d 1371 (Fed. Cir. 2019) (en banc). This fast letter was rescinded in May 2013 when it was incorporated into the M21-1. *See* Secretary's Response (Resp.) to Court's November 2021 Order, Appendix 1.

[14] R. at 30.

[15] *Id.* The C&P Service noted that the special consideration allowing proof of exposure based on service on or near base perimeters would provide a basis for a veteran to establish "presumptive service connection of the diseases associated with herbicide exposure." *Id.*

[16] *Id.*

[17] *Id.*

[18] Secretary's Resp., Appendix 1.

[19] M21-1, pt. VIII, subpt. i, ch. 1, § A.4.a.

[20] *Id.*, pt. VIII, subpt. i, ch. 1, § A.4.b.

4

the "special consideration" applies, which includes Takhli.[21] The manual then prompts an adjudicator to determine whether the veteran was an Air Force "security policeman, security patrol dog handler, member of the security police squadron, or otherwise near the air base perimeter as shown by evidence of daily work duties, performance evaluation reports, or other credible evidence."[22] If so, the provision directs an adjudicator to "concede herbicide exposure on a direct[ or ]facts-found basis."[23]

In his filings in this appeal, the Secretary noted that he had initiated formal notice-and-comment rulemaking in 2017 to address in a regulation the Thailand exposure issue addressed in the M21-1 in order to create a cohesive policy for adjudicating claims based on herbicide exposure in Thailand.[24] However, he noted that rulemaking is a slow process and that that process was ongoing with respect to herbicide exposure in Thailand.[25] So, we do not know whether or when the "special consideration" set out in the M21-1 will appear in a regulation or what such a regulation may provide.

In sum, the M21-1 provision remains VA's guidance for adjudicating claims based on herbicide exposure for Thailand veterans. The language of the M21-1, specifically the phrase "otherwise near the air base perimeter," provides the backdrop for the development of appellant's diabetes mellitus claim, to which we turn now.

## II. FACTS AND PROCEDURAL HISTORY

During his time in the Air Force, appellant served at the Takhli RTAFB from January 1969 to January 1970 as an electronic warfare systems repairman, working on aircraft at the base.[26] In March 2014, he filed a claim seeking entitlement to service connection for diabetes mellitus, type II.[27] He alleged that this condition was caused by his exposure to herbicides during his Thailand

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *See* Secretary's Resp. at 20-22.

[25] *Id.*

[26] R. at 867, 959, 1080.

[27] R. at 1087-89.

service.[28] Appellant subsequently described how he had worked 10 hours per day on the flight line at Takhli RTAFB, which he maintained was close to the base perimeter.[29] In further support of his claim, appellant submitted photographs showing his living quarters in Thailand and the location of the Takhli RTAFB flight line where he performed his duties working on aircraft.[30]

In March 2015, a VA examiner noted appellant's diagnosis of diabetes mellitus, type II.[31] However, that same month, VA denied service connection for this condition, finding that his current diagnosis was not related to his military service.[32] Appellant filed a Notice of Disagreement, specifically noting that VA had recently recognized Takhli RTAFB as a location where herbicides were used.[33] He perfected an appeal to the Board in November 2015, again alleging that the flight line and his living quarters were near the base perimeter and that "both areas had drain ditches where spray could float along."[34] He also explained that he frequently traveled to the runway and the radio station to call his wife, both of which were very close to the base perimeter.[35] In connection with his appeal, appellant submitted buddy statements describing his work on the flight line and its proximity to the perimeter of the base, along with additional photographs and maps that showed the layout of the base.[36] He also informed VA that his living quarters were located near the base perimeter and had open windows and doors with no air conditioning.[37] In January 2019, appellant appeared at a Board hearing at which he testified that he had worked on the flight line within 100 yards of the perimeter fence and that he often worked even closer, between 20 to 30 yards from the perimeter.[38]

---

[28] R. at 1087-88.

[29] R. at 625.

[30] R. at 618-21.

[31] R. at 456.

[32] R. at 429-33, 437-42.

[33] R. at 420-21.

[34] R. at 384-85.

[35] R. at 385.

[36] R. at 311-21, 325, 345.

[37] R. at 322.

[38] R. at 288-89.

6

In April 2019, the Board denied appellant entitlement to service connection for diabetes mellitus, type II, finding that the evidence of record did not support a finding that he was exposed to herbicides in Thailand.[39] The Board, in part, found appellant's statements related to his experience at the Takhli RTAFB of little probative value because of the time that had elapsed since his service in Thailand.[40] Specifically, the Board found appellant's "memory of the activities that placed him close to the perimeter to be too tenuous to be considered [ ] significantly credible and probative."[41]

In its decision, while it did not cite the M21-1 by name, the Board employed the language of the M21-1 provision concerning herbicide exposure in Thailand, explaining that "[s]pecial consideration of herbicide exposure on a factual basis should be extended" to certain Thailand veterans, and using the "otherwise near the air base perimeter" language to describe some Thailand veterans who qualified for this consideration.[42] The Board found that appellant did not qualify for the "special consideration" and thus had not established he was exposed to herbicides at Takhli RTAFB.[43] Thereafter, appellant appealed the Board's decision to this Court.

In January 2020, the Court granted a joint motion for remand (JMR) that recited the parties' agreement that the Board's statement of reasons or bases was inadequate because of its reliance on the passage of time to discount appellant's statements about his presence near the perimeter of Takhli RTAFB.[44] Specifically, the parties agreed that "all personal accounts of being near the perimeter at the RTAFB would necessarily have taken place more than 45 years ago," which was the Board's reason for downgrading the probative value of appellant's statements.[45] Additionally, the parties agreed that the Board "discounted lay statements regarding [a]ppellant being near the RTAFB perimeter due to his working on the flight line, the placement of his barracks and his entering and exiting the base as 'insufficient'" because the Board relied on the lack of a presumption

---

[39] R. at 249-60.

[40] R. at 253.

[41] *Id.*

[42] R. at 252.

[43] R. at 254.

[44] R. at 227-34.

[45] R. at 228-29.

of herbicide exposure for Thailand veterans.[46] But the parties noted that the "lack of a presumption does not relieve the Board from providing [a]ppellant special consideration of herbicide exposure on a factual basis . . . and the Board should have conducted a facts-found determination of herbicide exposure."[47] The matter then returned to the Agency.

In the June 2020 decision on appeal, the Board again denied service connection for diabetes mellitus, type II, reaching the same conclusion it had before, namely that the evidence did not support appellant's exposure to herbicides in service. As it had done in its earlier decision, the Board noted that herbicide exposure may be established for veterans that were stationed at certain RTAFBs and "served as an Air Force security policeman, security patrol dog handler, member of the security police squadron, or otherwise served near the air base perimeter as shown by evidence of daily work duties, performance reports, or other credible evidence."[48] The Board acknowledged appellant's reports that the flight line was "next to the runway, which was beside the base perimeter" and that his barracks were located close to one side of the base.[49] However, the Board found "the preponderance of the evidence is against a finding that [appellant's] daily work activities placed him near the perimeter or that [appellant] was exposed to herbicide agents."[50] The Board reasoned that if VA conceded herbicide exposure for appellant, "everyone who worked on the flight line would have been exposed to herbicide agents," something that would run counter to VA's position that Thailand veterans were not entitled to a presumption of exposure.[51] The Board applied a similar logic to appellant's reports of his living quarters being near the perimeter; it found that this "would create a slippery slope" that would mean "everyone assigned" to those barracks was exposed to herbicides.[52]

The Board noted that although appellant's personnel records confirmed his work on the flight line, "they do not specifically mention any work at or near the perimeter of the RTAFB."[53]

---

[46] R. at 229.

[47] Id.

[48] R. at 7.

[49] R. at 9.

[50] R. at 11.

[51] Id.

[52] Id.

[53] R. at 12.

Similarly, the Board rejected the buddy statements appellant had submitted; the Board reasoned that though one buddy statement supported appellant's assertion that he had worked on the flight line, that did not trigger a presumption of exposure, and another buddy statement did not establish sufficient proximity to the perimeter.[54] As to the photographs and maps appellant submitted, the Board rejected this evidence as well because it concluded the submissions did not "demonstrate that [appellant's] regular activities or duties placed him at or near the perimeter."[55] The Board also noted that appellant was inconsistent in reporting the time he worked on the flight line during service because he had stated both that he had worked 10 and 12 hour shifts.[56] The Board also noted that appellant had provided inconsistent information about precisely when in the 1990s he was diagnosed with diabetes mellitus.[57] The Board further impugned appellant's credibility because of the "passage of time since his service at a[n] RTAFB," stating that appellant's "memory of activities that places him near the perimeter [is] too tenuous to be persuasive."[58] The Board then concluded that the "preponderance of the evidence is against a finding that [appellant] was a security policeman, a member of the security police squadron, or a security patrol dog handler during his period of service," and that appellant had not established that "his regular work duties placed him near the perimeter."[59] Appellant then returned to the Court, leading to the appeal before us today.

## III. PARTIES' ARGUMENTS

Appellant argues that the Board erred by essentially ignoring the "special consideration" the M21-1 provides for establishing herbicide exposure on a facts-found basis through the consideration of case-specific evidence.[60] He contends that the Board used the language of the M21-1 and yet rejected the "'other credible evidence'" of exposure he had submitted, specifically,

---

[54] R. at 12-13.

[55] R. at 13.

[56] R. at 12.

[57] R. at 8.

[58] R. at 14.

[59] *Id.*

[60] Appellant's Brief (Br.) at 11-13.

9

credible evidence that he had served near the perimeter, without a proper basis for doing so.[61] Appellant asserts that the Board relied on a lack of corroboration in his personnel records, which did not document guard or security duties, and ignored that the M21-1 provision does not limit a concession of herbicide exposure to only those types of military occupations.[62]

Appellant also argues that the Board erroneously rejected objective evidence that corroborated his lay statements about his service near the Takhli RTAFB perimeter.[63] Particularly, he asserts that the Board did not dispute the credibility of the photographs, maps, and buddy statements he had submitted and thus that evidence is presumed credible and establishes that he had worked on the flight line, which was near the base perimeter.[64] Appellant further contends that the Board provided legally insufficient reasons for rejecting his lay evidence about his service in Thailand that put him near the base perimeter. He notes that the Board relied on his supposed inconsistent statements about the exact year he was diagnosed with diabetes mellitus and whether he had worked 10 or 12 hours a day during service.[65] Appellant argues that it was improper for the Board to discredit his statements because these inconsistencies, assuming they are inconsistencies, were not material to establishing service connection for diabetes mellitus.[66] He also challenges the Board's reliance on the passage of time since his service in Thailand to question his credibility.[67] Appellant notes that the January 2020 JMR rejected this precise type of reasoning and ordered the Board to reevaluate his statements.[68] Here, he argues, the Board committed the same error that had been identified in connection with the earlier Board decision.[69]

---

[61] *Id*. at 9-10 (quoting R. at 7).

[62] *Id*. at 13-14.

[63] *Id*. at 19-22.

[64] *Id*. at 19-20.

[65] *Id*. at 14-18.

[66] *Id*. at 15-16.

[67] *Id*. at 17-18.

[68] *Id*.

[69] *Id*. at 17.

Although appellant argued in his briefing that the Board's errors required reversal of its decision,[70] at oral argument he conceded that remand is the appropriate remedy.[71] Appellant changed his position because he recognized that there are factual findings that the Board needs to make in the first instance even if the Court identifies errors in the Board's decision on appeal.[72]

In response, the Secretary questions whether the M21-1 provision is binding on the Board and notes that any error in its application would not warrant remand.[73] However, even if the M21-1 applies, the Secretary argues, the Board properly applied the "special consideration" provided in the M21-1 provision, and correctly found that appellant's military occupation, working on the flight line, consisted of duties that are inherently different from the examples of duties listed in the M21-1 as sufficient to concede herbicide exposure.[74] Specifically, the security jobs listed in the M21-1 required servicemembers to be "on or near the perimeter[]."[75] The Secretary asserts that appellant's statements that he was often within 500 meters of the perimeter were not sufficient.[76] The Secretary also disputes appellant's characterization of the weight the Board assigned to the evidence he submitted about his proximity to the base perimeter both while he worked on the flight line and while he was in his living quarters.[77]

One final point: Following the completion of the parties' briefing in this matter, the Court ordered the Secretary to submit additional information regarding VA's policy on herbicide exposure in Thailand. In his response, the Secretary argues, in part, that "on" and "near" as used in the M21-1 provision are synonymous.[78] He contends that the phrase "on or near the perimeter[]" means close enough to physically touch the perimeter structure.[79] He further asserts that the

---

[70] *Id*. at 22-24.

[71] Oral Argument (O.A.) at 2:20-:45, *Stover v. McDonough*, U.S. Vet. App. No. 20-5580 (argued Apr. 5, 2022), http://www.uscourts.cavc.gov/oral_arguments_audio.php.

[72] *Id*.

[73] *Id*. at 24-30.

[74] Secretary's Br. at 22.

[75] *Id*. at 21-22.

[76] *Id*. at 19-20.

[77] *Id*. at 14-19.

[78] Secretary's Resp. at 3.

[79] *Id*. at 6.

provision's focus on the perimeter requires the application of an exclusion canon, such that by applying the provision to those at the perimeter, VA necessarily excluded other parts of the RTAFBs, such as the flight line.[80]

## IV. ANALYSIS

We begin our analysis with the legal landscape that sets the scene for this case. We then address the parties' dispute about the M21-1 provision concerning herbicide exposure in Thailand, particularly whether the Board was bound by that provision. We hold that the Board was bound by the M21-1's provision about herbicide exposure in Thailand in *this* case because the Board adopted the provision as the rule of decision it would apply to assess appellant's diabetes mellitus, type II, claim. We then turn to the Board's application of the M21-1 provision it adopted as the rule of decision. We hold that the Board did not explain what it understood the phrase "near the perimeter[]" to mean. Without providing a definition of this phrase, appellant was left to guess what he needed to do to prove his claim, and this Court is prevented from effectively reviewing the Board's decision. Therefore, remand is warranted. Finally, we will provide the Board with additional guidance on remand as it relates to missing factual findings, credibility, compliance with the 2020 JMR, and applying the benefit of the doubt doctrine.

### A. Legal Landscape

Establishing service connection generally requires evidence of (1) a current disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a nexus between the claimed in-service disease or injury and the present disability.[81] VA presumptively awards service connection for diabetes mellitus, type II, if a claimant shows exposure to certain herbicide agents in service.[82] Here, the Board conceded that appellant has a diagnosis of diabetes mellitus, type II.[83] On appeal, appellant only challenges the Board's findings that his exposure to herbicides while serving in Thailand could not be established such that service connection for diabetes mellitus would be presumed under the law. He does not raise any arguments with respect to direct service

---

[80] *Id.* at 4-5.

[81] *See Hickson v. West*, 12 Vet.App. 247, 253 (1999); 38 C.F.R. § 3.303(a) (2022).

[82] 38 C.F.R. § 3.309(e) (2022).

[83] R. at 8.

connection for his diabetes mellitus, other than based on exposure to herbicides, so we deem him to have abandoned any appeal of that theory of establishing service connection.[84]

The Court reviews the Board's findings regarding service connection for clear error.[85] For all its findings on a material issue of fact and law, the Board must support its decision with an adequate statement of its reasons or bases that enables a claimant to understand the precise bases for the Board's decision and facilitates review in this Court.[86] To comply with its requirement to provide an adequate statement of reasons or bases, "the Board must analyze the credibility and probative value of the evidence, account for the evidence that it finds persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant."[87] If the Board fails to do so, remand is appropriate.[88]

### B. The Board adopted the M21-1 Thailand herbicide exposure provision as the rule of decision for appellant's claim

Whether an M21-1 provision can be binding on the Board as a matter of law is a complicated question. Perhaps one day the Court will need to wrestle with that more general quandary. But today is not that day. The Secretary points out that the M21-1 is not binding on the Board generally, citing 38 C.F.R. § 20.105.[89] That regulation provides that "the Board is bound by applicable statutes, regulations of the Department of Veterans Affairs, and precedent opinions of the General Counsel of the Department of Veterans Affairs," but the Board "is not bound by Department manuals, circulars, or similar administrative issues."[90] Because, the Secretary contends, the M21-1 is a "Department manual," it is not binding on the Board. But the Secretary's reliance on this regulation ignores what happened in *this* matter and ignores the caselaw from this Court that establishes that the Board (1) cannot ignore relevant M21-1 provisions, and (2) more significantly, can actually take action that makes the M21-1 binding in a particular case.

---

[84] *See Pederson v. McDonald*, 27 Vet.App. 276, 285 (2015) (en banc).

[85] *Dyment v. West*, 13 Vet.App. 141, 144 (1999), *aff'd sub nom. Dyment v. Principi*, 287 F.3d 1377 (Fed. Cir. 2002).

[86] 38 U.S.C. § 7104(d)(1); *Gilbert v. Derwinski*, 1 Vet.App. 49, 56-57 (1990).

[87] *Kahana v. Shinseki*, 24 Vet.App. 428, 433 (2011) (citing *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996)).

[88] *Tucker v. West*, 11 Vet.App. 369, 374 (1998).

[89] Secretary's Br. at 28.

[90] 38 C.F.R. § 20.105 (2022).

Beginning with this second point – that is, situations in which the Board adopts an M21-1 provision as the rule of decision in a case – most recently, in *Andrews v. McDonough*, this Court held that "the significance ascribed to the M21-1 in an individual appeal often turns on the context of the case and the nature of [the] Board's analysis and treatment of the provision—that is, whether and to what extent it relied on or departed from the provision and the rationale behind such decision."[91] In the appeal in *Andrews*, the Board incorporated an M21-1 provision related to hepatitis C into a prior remand to a regional office (RO) and then "applied its substantive provisions regarding risk factors" in its decision.[92] Given the Board's actions, the Court held that

> [e]ven though we likely could not independently turn to the M21-1 to inform our decision of whether the Board erred in determining that Mr. Andrews hasn't met his burden of proof, doing so is appropriate here because the Board's 2017 remand order and 2018 decision adopted the M21-1's guidance on adjudicating service connection for hepatitis C in this case.[93]

In this matter, while the Board did not cite the M21-1 Thailand herbicide exposure provision, it employed the language of the provision in its June 2020 decision.[94] The Board based its analysis on whether appellant served "near the perimeter[]" of the Takhli RTAFB, a concept rooted in the M21-1, and the Board repeated the language of the M21-1 almost verbatim.[95] Additionally, the Secretary concedes the Board "cited language from the Thailand provision and then applied it" in this case.[96] Therefore, the Board consistently employed the substance of the M21-1 Thailand herbicide exposure provision as the yardstick by which it was measuring appellant's diabetes mellitus claim.

And this was not the first time the Board looked to the substance of the M21-1 Thailand provision as the legal standard by which to assess appellant's claim. In the Board's prior, April 2019 decision on appellant's diabetes mellitus claim, the Board used the same "[s]pecial consideration" language for establishing herbicide exposure based on service on or near the

---

[91] 34 Vet.App. 216, 223 (2021).

[92] *Id.* at 224.

[93] *Id.*

[94] R. at 7-8.

[95] R. at 7 (noting "[s]pecial consideration of exposure to herbicide agents" on a factual basis where a veteran's duties placed him on or near the perimeter of an RTAFB), 11-14.

[96] Secretary's Br. at 8.

perimeter of an RTAFB.[97] And the parties understood that the Board had adopted the M21-1 standard as the test in this appeal. We know that because in the January 2020 JMR, the parties relied on the language of the M21-1 in finding that remand was warranted, tracking what the Board had done in the decision then on appeal. Specifically, the parties noted the Board was required on remand to provide "special consideration of herbicide exposure on a factual basis," and the Board "should have conducted a facts-found determination of herbicide exposure" based on appellant's reports of working and sleeping near the base perimeter.[98]

The prior Board decision, the JMR language, and the Board's analysis in the June 2020 decision establish that, as in *Andrews*, the Board here adopted the M21-1 Thailand herbicide exposure provision as the rule of decision that would govern the adjudication of appellant's diabetes mellitus, type II, claim. Understandably, appellant developed his claim by showing his proximity to the base perimeter by submitting photographs, maps, and lay statements to establish that he worked on the flight line close to the base perimeter and that his assigned living quarters were located close to the base perimeter fence. Therefore, although we can proceed on the assumption that the M21-1 is not binding on the Board in every case, the Board adopted the M21-1 Thailand herbicide exposure provision in *this* case when it repeatedly used the M21-1 standard as the rule of decision when adjudicating appellant's claim. And, as we said, the parties understood that to be the case as seen in the terms of the JMR, which was based in part on the Board's misapplication of the M21-1 standard.

The Secretary seeks to distinguish this appeal from that in *Andrews*, focusing on the fact that in *Andrews* the Board incorporated the M21-1 provision about hepatitis C into a remand to an RO, instructing the RO to comply with that provision.[99] The Secretary argues that in this case there are no such prior remand instructions. That is true but also irrelevant. We do not read *Andrews* so narrowly. Instead, we read *Andrews* to hold that the context and nature of a Board's analysis and treatment of an M21-1 provision dictate whether, and to what extent, the Board makes the M21-1 the rule of a decision in a particular case. In *Andrews*, the Board did so through the adoption of an M21-1 provision in a remand to an RO. Here, it did so through the adoption of an M21-1 provision

---

[97] R. at 252.

[98] R. at 229.

[99] Secretary's Resp. at 26-27; O.A. at 42:42-43:22.

15

in both the prior and current Board decisions, as recognized in the JMR. So, the procedural history here may be different from that in *Andrews*, but the result remains the same. In sum, the Board adopted the M21-1 Thailand herbicide exposure provision as the rule of the decision in this case.[100]

### C. Board's Application of the M21-1 Thailand Herbicide Exposure Provision

Having established that the Board adopted the M21-1 Thailand herbicide exposure provision as the rule of decision for appellant's claim, we now turn to how the Board applied that rule. We hold that the Board failed to provide an adequate statement of its reasons or bases for its decision because it did not explain what it understood the phrase "near the perimeter[]" as used in the adopted M21-1 provision to mean. So, appellant was not fully informed of the standard by which his diabetes mellitus claim would be adjudicated and, correspondingly, the Court cannot meaningfully engage in judicial review of the Board's decision.

We begin with some background. In *Cantrell v. Shulkin*, the Court held that the denial of entitlement to a total disability rating based on individual unemployability (TDIU) was flawed because of "VA's failure to define employment 'in a protected environment' or to otherwise specify the factors that adjudicators should consider in making that determination."[101] The Court reasoned that "[w]ithout a definition of the phrase or, at the very least, a list of factors that VA adjudicators should consider in making that determination, there is no standard against which VA adjudicators can assess the facts of a veteran's case."[102] The Court held that it "simply cannot sanction a statement of reasons or bases that amounts to finding that Mr. Cantrell was not employed in a protected environment 'because I say so.'"[103]

Similarly, in *Johnson v. Wilkie*, the Court held that the Board provided an inadequate statement of its reasons or bases when it failed to define "subjective terms of degree" used in the diagnostic code for rating headaches.[104] The Court noted that "[w]ithout a standard for comparing

---

[100] We note that even if the Board had not adopted the M21-1 Thailand herbicide exposure provision as the rule of decision in this case as in *Andrews*, the Board would still have been required to expressly discuss a relevant M21-1 provision. *See Overton v. Wilkie*, 30 Vet.App. 257, 259 (2018) (holding that the Board cannot ignore a relevant M21-1 provision); *see also Healey v. McDonough*, 33 Vet.App. 312, 320 (2021) (holding that "an agency cannot simply ignore an internal guidance manual when its contents relate[] to a particular claim or disability").

[101] 28 Vet.App. 382, 392 (2017).

[102] *Id*. at 390-91.

[103] *Id*. at 392 (quoting *Hood v. Brown*, 4 Vet.App. 301, 303 (1993)).

[104] 30 Vet.App. 245, 254 (2018).

and assessing terms of degree, [the Board's] conclusory findings [as to the degree of severity] are unreviewable in this Court."[105] The Court rejected VA's position that "the Board may make such determinations without any obligation to disclose the standard under which it is operating."[106]

The upshot of *Cantrell* and *Johnson* is that the Board errs when it adjudicates a claim based on undisclosed standards. When that happens, a claimant has no idea what he or she needs to prove to establish entitlement to benefits. And equally so, this Court has no basis on which to assess whether the Board erred when it adjudicated the claim. We reiterate again today that when the Board adjudicates a claim, it must explain what it understands the relevant legal standard to be.

Turning back to this case, in its June 2020 decision, the Board failed to explain what it understood "near the perimeter[]" to mean in the context of the M21-1 Thailand herbicide exposure provision it had adopted as the rule of decision in this case. The Board considered the evidence appellant pointed to as establishing that his duties and living quarters placed him near the base perimeter, but the Board concluded that the evidence did not satisfy the test it adopted for establishing herbicide exposure. The problem is that the Board never explains what it understands "near the air base perimeter" to mean or what appellant would need to show to prove herbicide exposure under whatever standard the Board (silently) used. Thus, appellant is left wondering what more he could have done, and this Court is unable to assess whether there was error in the Board's application of the M21-1 provision concerning herbicide exposure in Thailand that it adopted as the rule of decision with respect to appellant's diabetes mellitus claim. Simply stated, how can we assess error when we are unable to determine the standard the Board used?

We note that the Board comes closest to defining "near the perimeter" by stating what it understood was *not* near the perimeter. Specifically, the Board found that if appellant was found to have served "near the perimeter," then other similarly situated veterans would also be entitled to a finding of herbicide exposure, essentially, in the Board's view, creating a presumption of herbicide exposure in Thailand that Congress did not intend.[107] The Board noted "this view would create a slippery slope . . . line of reasoning that is not supported by VA law."[108]

---

[105] *Id.* at 255.

[106] *Id.*

[107] R. at 11.

[108] *Id.*

17

The Board's reasoning is defective because it essentially ignores the language of the M21-1 provision it adopted as the rule of decision. The Board rejected the notion that working on the flight line or living in proximity to the base perimeter could satisfy the M21-1 provision and establish exposure to herbicides. By doing so, the Board's "slippery slope" analysis appears to limit the concession of herbicide exposure in the M21-1 provision to only those servicemembers who served as "a security policeman, security patrol dog handler, [or] member of a security police squadron."[109] In other words, the Board seems to cut off entitlement to the "special consideration" VA adopted for servicemembers who "otherwise [served] near the air base perimeter."[110] Thus, in providing what was not "near the perimeter," the Board reads out a portion of the M21-1 Thailand herbicide exposure provision it had adopted as the legal standard in this case, something it cannot do.[111] Therefore, as in *Cantrell* and *Johnson*, we must remand this matter for the Board to define "near the perimeter" so that appellant can understand the standard under which the Agency will evaluate his claim.

We recognize that, in response to a Court order, the Secretary provided a definition of "near the perimeter." The Secretary contends that "near the perimeter" is akin to "on the perimeter" and requires a veteran to have served in an MOS that allowed for him or her to be close enough to the perimeter fence as to be able to physically touch it.[112] The Secretary's definition does not save the Board's decision. First, as discussed above, the Board failed to explain what it understood "near the perimeter" to mean. The Secretary may not step into the Board's shoes to meet the Board's reasons-or-bases requirement.[113] Thus, the Board must define the phrase "near the perimeter" in the first instance.[114]

Second, even if we put aside that it is the Board that must provide an adequate statement of reasons or bases, the Secretary's definition of "near the perimeter" does not appear to be the way that the *Board* understood the phrase throughout the adjudication of appellant's diabetes mellitus

---

[109] M21-1, pt. VIII, subpt. i, ch. 1, § A.4.b.

[110] *Id.*

[111] *See, e.g., Jensen v. Shulkin*, 29 Vet. App. 66, 74 (2017) (holding that courts must avoid rendering certain portions of a provision meaningless when interpreting their meaning).

[112] Secretary's Resp. at 3-6.

[113] *See Simmons v. Wilkie*, 30 Vet. App. 267, 277 (2018), *aff'd*, 964 F.3d 1381 (Fed. Cir. 2020).

[114] *See Hensley v. West*, 212 F.3d 1255, 1263-64 (Fed. Cir. 2000).

claim. For example, in its April 2019 decision, the Board rejected appellant's evidence not on the basis that it did not establish that he could not touch the perimeter fence, but rather because, in large measure, it assessed the evidence was not credible based on the passage of time.[115] Moreover, it does not seem that the Secretary himself held this view of "near the perimeter" before his supplemental submission in this appeal. The Secretary agreed to a JMR in January 2020 concerning the April 2019 Board decision based on an error in the Board's credibility determination, directing the Board to reassess the appellant's statements concerning the flight line and his living quarters.[116] In sum, while we offer no opinion about the merit of the Secretary's proffered definition of "near the perimeter," on remand, the Board must take care to ensure that it considers the procedural history and development of appellant's claim when it defines "near the perimeter." As we warned in *Andrews*, the Board cannot engage in "'goalpost-moving'" by changing the standards it uses to assess a veteran's claim.[117]

### D. Additional Guidance on Remand

While remand is required based on the Board's failure to explain its understanding of "near the perimeter" standing alone, we will provide guidance to the Board about several matters that are likely to recur on remand.[118] First, the Board failed to make findings regarding appellant's proximity to the base perimeter during his time serving at the Takhli RTAFB. No matter what definition of the phrase the Board uses, it needs to assess the evidence appellant submitted about the proximity question. Specifically, appellant submitted evidence, including photographs, maps, and buddy statements. While the Board rejected this evidence, finding it was not sufficient to establish herbicide exposure,[119] the Board made no findings about how close in terms of feet, yards, or meters appellant actually was to the base perimeter and how frequently and for how long he was within that distance based on the *evidence*. The Board for the most part simply concluded the evidence was not sufficient to support service connection for diabetes mellitus, type II, without explaining what the evidence showed. And, to the extent that the Board did acknowledge that the

---

[115] R. at 253-54.

[116] R. at 228-29.

[117] *Andrews*, 34 Vet.App. at 224 (quoting *Hudick v. Wilkie*, 755 F. App'x 998, 1007 (Fed. Cir. 2018)).

[118] *See Quirin v. Shinseki*, 22 Vet.App. 390, 395 (2009).

[119] R. at 13.

maps and photographs showed "some buildings that were more or less near the perimeter," it summarily concluded that this "does not . . . demonstrate[] that [appellant's] regular activities or duties placed him at or near the perimeter," without making any specific findings as to whether presence in those facilities could satisfy the M21-1 standard and, if so, how frequently or for how long appellant may have been in those facilities.[120]

Second, at the January 2019 Board hearing, appellant testified that he worked 10 hours a day within 100 yards of the perimeter fence and that he often worked even closer, between 20 and 30 yards from the perimeter.[121] The Board did not address appellant's testimony, which is potentially favorable evidence establishing his proximity to the base perimeter.[122] On remand, the Board must address all evidence establishing appellant's proximity to the base perimeter and make factual findings about how close to the perimeter appellant was throughout his time in service at Takhli RTAFB in the first instance.[123]

Third, we remind the Board that a claimant has the right to compliance with a remand from this Court.[124] And the Secretary has a duty "to ensure compliance with the terms of the remand."[125] The Secretary fulfills this duty by substantially complying with the order, because we have recognized that absolute compliance is not necessary.[126] In the January 2020 JMR, the parties agreed that the Board provided inadequate reasons or bases for rejecting appellant's accounts of his service in Thailand based on the passage of time, 45 years.[127] Yet, in the June 2020 decision on appeal, the Board primarily offered the same rationale for rejecting appellant's statements about his Thailand service, specifically that appellant's memory was "too tenuous to be persuasive."[128] The Secretary argues that the Board is allowed to consider the passage of time in weighing

---

[120] *Id.*

[121] R. at 288-89, 625.

[122] *Caluza*, 7 Vet.App. at 506.

[123] *See Tadlock v. McDonough*, 5 F.4th 1327, 1335-36 (Fed. Cir. 2021).

[124] *Stegall v. West*, 11 Vet.App. 268, 271 (1998); *see Forcier v. Nicholson*, 19 Vet.App. 414, 425 (2006) (citing *Stegall* and holding that the Board "has a duty . . . to ensure compliance with the terms of the agreement struck by the parties"), *aff'd per curiam*, 221 F. App'x 996 (Fed. Cir. 2007).

[125] *Id.*

[126] *See, e.g., Dyment*, 13 Vet.App. at 146-47.

[127] R. at 228-29.

[128] R. at 14.

evidence of record and that the JMR only called for the Board to reconsider the lay evidence in light of the fact that all personal accounts of Thailand service took place 45 years ago.[129] Fair enough. However, it is unclear that the Board substantially complied with the JMR given the way in which it addressed the issue, namely that it used essentially the same language that the JMR identified as problematic and did not provide further explanation as to what specific memories the Board found to be impacted by the passage of time or why. On remand, the Board should ensure that it substantially complies with the terms of the JMR.

Fourth, the Board also impugned appellant's credibility due to what it found to be inconsistencies in his statements. Specifically, the Board concluded that appellant gave multiple answers to questions concerning the year in which he was diagnosed with diabetes mellitus.[130] To begin with, even assuming the Board was correct that appellant gave inconsistent answers as to his date of diagnosis, it is not clear from the Board's decision why it matters for purposes of establishing herbicide exposure. After all, the Board conceded he was diagnosed with diabetes mellitus and that medical records show that diagnosis occurred in the mid-1990s.[131] Moreover, the multiple answers the Board identified all referred to a diagnosis in the mid-1990s, deviating only between 1993 and 1995.[132] The Board also noted that appellant was inconsistent regarding the number of hours he worked each day on the flight line in Thailand, variously describing 10- and 12-hour days.[133] Again, the Board does not explain why this "inconsistency" was material to its assessment of the evidence concerning herbicide exposure. On remand, the Board must carefully assess appellant's credibility and fully explain how any alleged inconsistencies it identifies impact its credibility assessment.

Finally, we note that in its decision the Board makes several references to the "preponderance of the evidence" being against appellant's claim.[134] Since the Board's June 2020 decision, the Federal Circuit has reconsidered the benefit of the doubt doctrine and acknowledged

---

[129] Secretary's Br. at 16.

[130] R. at 8, 14.

[131] R. at 8.

[132] Id.

[133] R. at 12.

[134] See R. at 11, 14-15.

21

that the "preponderance of the evidence" language could be read out of context to impose a burden on claimants that is higher than Congress required.[135] The court stated that "to eliminate the potential for confusion going forward, we depart from . . . 'preponderance of the evidence' language and determine that the benefit-of-the-doubt rule simply applies if the competing evidence is in 'approximate balance,'" which requires that the evidence be nearly equal.[136] On remand, the Board must ensure that it considers whether the evidence is "nearly equal" or "in approximate balance" in applying the benefit of the doubt doctrine as *Lynch* instructs.

### E. Appellant's Rights on Remand

On remand, appellant may submit additional evidence and argument and has 90 days to do so from the date of VA's postremand notice.[137] The Board must consider any such additional evidence or argument submitted.[138] The Board must also proceed expeditiously.[139]

## V. CONCLUSION

After consideration of the parties' briefs, oral argument, the record on appeal, and the governing law, the Court SETS ASIDE the June 10, 2020, Board decision and REMANDS this matter for further proceedings consistent with this decision.

GREENBERG, J., *concurring*: Justice O'Connor once wrote: "While unanimity is most certainly a goal of the present-day Court, it does not overwhelm our other goals. When agreement cannot be reached, each one of us takes the opportunity to make our disagreement known, often quite forcefully." Sandra Day O'Connor, *William Howard Taft and the Importance of Unanimity*, 28 J. SUP. CT. HIST. 157, 162 (2003). I agree that the Board's failure to explain what it believed the term "near the perimeter" meant led to arbitrary decisionmaking. And though the majority's opinion is well written and well intentioned, I write separately because I believe the decision does not go nearly far enough and will result in more confusion and arbitrary decisionmaking regarding

---

[135] *Lynch v. McDonough*, 21 F.4th 776, 781-82 (Fed. Cir. 2021) (en banc).

[136] *Id.*

[137] *Kutscherousky v. West*, 12 Vet.App. 369, 372-73 (1999) (per curiam order); *see also Clark v. O'Rourke*, 30 Vet.App. 92, 97 (2018).

[138] *Kay v. Principi*, 16 Vet.App. 529, 534 (2002).

[139] 38 U.S.C. § 7112.

those veterans who served in Thailand during the Vietnam era and were exposed to herbicides. The Court has simply not helped Thailand veterans whose exposure to herbicides 50 years ago is still being questioned. Today's decision will lead to further litigation, and wrongful denials.

We should have reversed, entered judgment in favor of the veteran, and concluded that the veteran's uncontroverted evidence creates an irrebuttable presumption that the M21-1 provision has been satisfied.

I.

The appellant served on active duty in the U.S. Air Force from December 1966 to December 1970, including service in Thailand, as an electronic warfare repairman. R. at 1080 (DD Form 214). He was stationed in Thailand at Takhli RTAFB from January 1969 to January 1970, where he worked on the flight line and where, he alleges, he was exposed to Agent Orange. R. at 898-902.

II.

In February 1973, Major Barnette and Captain Barrow submitted the CHECO Report, detailing base defense practices in Thailand. R. at 48. The report reflects that base-perimeter security was a concern for these bases because fences "don't stop determined sapper squads." R. at 49. The perimeters were not secured uniformly; rather, parts of the perimeters were protected with various forms of barbed wire and other portions of the perimeter were merely marked with chain-link fences. *Id.* Major Barnette acknowledged that "[t]o further aid in observation, herbicides were employed to assist in the difficult task of vegetation control. Use of these agents was limited by such factors as the [rules of engagement] and supply problems." *Id.* The report later states:

> The extent to which vegetation has been cleared is graphically illustrated in the case of [Nakhon Phanom RTAFB]. The photograph of that base on the following map shows the extent of vegetation *inside* the base perimeters in the early days of construction when the airfield was carved out of virgin jungle. An interesting comparison between [Nakhon Phanom RTAFB] 1966 and [Nakhon Phanom RTAFB] 1972 can be made by reference to the picture of that base that appears earlier in this report.

R. at 50 (emphasis added). The CHECO Report remained classified for decades.

23

In May 2010, VA's C&P Service released a bulletin[140] in which it conceded that "there was significant use of herbicides on the fenced in perimeters of military bases in Thailand intended to eliminate vegetation and ground cover for base security purposes." R. at 30. In the bulletin the C&P Service specifically cited the CHECO Report as evidence of herbicide use in Thailand and announced the following policy:

> [S]pecial consideration of herbicide exposure on a facts found or direct basis should be extended to those Veterans whose duties placed them on or near the perimeters of Thailand military bases. This allows for presumptive service connection of the diseases associated with herbicide exposure. The majority of troops in Thailand during the Vietnam Era were stationed at the [RTAFBs] of U-Tapao, Ubon, Nakhon Phanom, Udorn, Takhli, Korat, and Don Muang. If a U.S. Air Force Veteran served on one of these air bases as a security policeman, security patrol dog handler, member of a security police squadron, or otherwise served near the air base perimeter, as shown by MOS . . . , performance evaluations, or other credible evidence, then herbicide exposure should be acknowledged on a facts found or direct basis.

*Id*.

In May 2013, VA incorporated the policy announced in this bulletin into the M21-1. Today, the M21-1 states: "[S]pecial consideration of exposure to herbicide agents on a factual basis should be extended to Veterans whose duties placed them on or near the perimeters of Thailand military bases." M21-1, pt. VIII, subpt. i, ch. 1, § A.4.a.[141] The manual then instructs adjudicators to determine whether the veteran served at one of several RTAFBs, and if so, to determine whether the veteran served as an Air Force security policeman, security patrol dog handler, member of the security police squadron, or "otherwise served near the air base

---

[140] The original language of the bulletin is found in VA Fast Letter 09-20, which pertained to cases stayed as part of the litigation in *Haas v. Peake*, 525 F.3d 1168 (Fed. Cir. 2008). This fast letter was rescinded in May 2013, when it was incorporated into the M21-1. The fast letter included a memorandum of record that curiously states that "[w]hile the Thailand CHECO Report does not report the use of tactical herbicides on allied bases in Thailand, it does indicate sporadic use of non-tactical (commercial) herbicides within fenced perimeters." Response to Nov. 2, 2021, Order at 38. Not only does the CHECO report not distinguish between "commercial" and "tactical" herbicides, but Major Barnette also specifically noted that the rules of engagement were a limiting factor in the use of herbicides. R. at 49.

[141] During the appeal, VA reorganized the M21-1. Portions of this opinion quote documents submitted to the Court before the reorganization, when the provisions entitled "Special Consideration for Claims Based on Herbicide Exposure in Thailand During the Vietnam Era" were found at M21-1, pt. IV, subpt. ii, ch. 1, § H.4a, b. The substance of the provision has not changed since VA originally incorporated it into the manual in 2013.

perimeter"[142] as shown by evidence of daily work duties, performance reports, or other credible evidence. M21-1, pt. VIII, subpt. i, ch. 1, § A.4.b.

III.

In March 2014, the appellant filed for VA disability benefits for diabetes. R. at 1087-89. He asserted that his diabetes was caused by his exposure to Agent Orange during his service in Thailand. R. at 1087. In July 2014, the appellant submitted photographs of the open-air "hooch," that is, the living quarters he stayed in for the first 7 months of his tour at Takhli RAFTB; the barracks where he subsequently lived; and the Takhli flight line. R. at 618-25. In addition, he submitted private treatment records. *Id.*

In March 2015, the appellant underwent a VA diabetes mellitus examination where he was diagnosed with diabetes. R. at 456-59. Later that month, the RO denied the appellant's claim, finding that his MOS, along with the evidence in his service personnel records, did not establish that he had served near the air base perimeter to warrant a concession of herbicide exposure. R. at 429-30.

In November 2015, the appellant perfected his appeal to the Board, arguing that the flight line and his living quarters at Taklhi RTAFB were near the perimeter of the base, and that "[b]oth areas had drain ditches where spray would float along." *Id.* The appellant explained that he also frequently traveled onto the runway and to the Military Auxiliary Radio System (MARS) stations along the perimeter. *Id.*

In 2018, the appellant submitted another statement, as well as buddy statements from his wife and fellow airmen, that corroborated the appellant's reports of his service in Thailand. *See, e.g.*, R. at 311, 322, 325, 345. A fellow airman explained that he had worked with the appellant on the flight line. R. at 325. The airman noted a lack of lighting at the perimeter of Takhli, but recalled "that those times light did shine on the taxiway the grass was brown even during the rainy season, [and] in retrospect I believe those 'grassy' areas . . . were brown because of Chemical Agent treatments." *Id.* He continued: "I remember Jack [the appellant] and I with other of our shift buddies attending several celebrations that the base had at the outdoor staging area. This

_____

[142] The Court notes that the phrases "near the perimeter" and "near the air base perimeter" are used interchangeably in this decision.

stage area was only feet from the perimeter, as a matter of fact just about anywhere you went on the base was only feet from the perimeter." *Id*.

In September 2018, the appellant also submitted photographs of Takhli RTAFB, noting the lack of vegetation next to runways on base, the proximity of his living quarters to barbed-wire fencing on the perimeter of the base, and the MARS station he frequented, which was surrounded by brown vegetation. R. at 312-20.

In January 2019, the appellant appeared at a Board hearing where he testified that at Takhli RTAFB he had worked on the flight line, which he believed was 100 yards from the perimeter, and at times would have to go to the ends of the runways for red ball emergency repairs to repair aircraft that had landed roughly 20 to 30 feet from the perimeter, and that he occasionally performed maintenance on aircraft that had been parked next to the fence of the perimeter. R. at 288. He also recounted seeing trucks "spraying things around the base." R. at 288-89. Towards the end of the hearing, the veteran submitted a prepared statement that provided in part that

> I also made frequent trips to the MARS radio station, which was almost on the perimeter, to call my wife over shortwave radio. I also exited the base once or twice a week to go to town. To exit I had to walk through the main gate, which was on the perimeter, and return the same way. I lived in a hooch which was made of 2x4s and screened wire. The windows were open which allowed anything sprayed to enter in through the hooch through the screened wire.

R. at 296-97. The veteran concluded his testimony by showing on one of the maps he submitted where he had lived at Takhli RTAFB and stating:

> I have submitted photographs of right beside the hooch rolled barbed wire and dead grass and during my whole time there I don't think I ever remember seeing anybody cut any grass, even though they're in the rainy season and monsoons,[143] it rained, the grass was dead on the base everywhere.

R. at 298-99. At no point during the hearing did the Board member explain how close to the perimeter the appellant needed to be or how often the appellant needed to be at the perimeter to have been found exposed to herbicides at Takhli Air Force Base on a conceded basis.

In April 2019, the Board applied the M21-1 Thailand herbicide exposure provision and denied the appellant's claim. R. at 246-60. The Board did not define "near the air base perimeter."

---

[143] The Court notes that the CHECO Report also describes that monsoon season made vegetation control at RTAFBs difficult. *See* B.H. BARNETTE, JR. & JAMES R. BARROW, DEPARTMENT OF THE AIR FORCE, PROJECT CHECO SOUTHEAST ASIA REPORT: BASE DEFENSE IN THAILAND 1968-1972, at 64 (1973) ("[T]ropical vegetation aided by seasonal monsoon rains grew almost faster than it could be controlled."), http://apps.dtic.mil/sti/pdfs/ADA586193.pdf.

Instead, the Board accepted that the appellant's testimony regarding his proximity to the perimeter, but found that

> the Veteran's explanation of being near the perimeter due to the placement of his barracks and from entering and exiting the base insufficient, as according to this statement, everyone assigned to these barracks or exiting and entering the base would have been exposed to herbicide agents. The Board notes that the herbicide agent presumption has not been extended to veterans who served at a[n] RTAFB. Therefore, exposure must be shown by at least an equipoise of the evidence standard.
>
> The Board acknowledges the Veteran's statements that he worked on the flight line near the perimeter. However, based on this explanation, everyone who worked on the flight line would have been exposed to herbicide agents. The herbicide agent presumption has not been extended to veterans who served on the flight line. As such, the testimony that he worked on the flight line is not probative enough to establish exposure to herbicide agents.
>
> In addition, considering the passage of time since his service at a RTAFB, the Board finds the Veteran's memory of the activities that placed him close to the perimeter to be too tenuous to be considered of any significantly credible and probative [sic]. As such, these statements do not qualify as "other credible evidence" sufficient to concede herbicide agent exposure.

R. at 253.

In January 2020, this Court granted the parties' joint motion for remand for the Board to provide an adequate statement of reasons or bases for its decision. R. at 169-76. Specifically, the parties agreed that

> [t]he Board denied Appellant's claim, in part, because his memory of activities that placed him close to the perimeter was "too tenuous to be considered of any significant[ ] credible [or] probative [value]" because of "the passage of time since his service at a [Royal Thai Air Force Base (RTAFB)]." (R. at 8 (5-13)). However, the Board failed to consider that all personal accounts of being near the perimeter at the RTAFB would necessarily have taken place more than 45 years ago. In addition, the [Board] discounted lay statements regarding Appellant being near the RTAFB perimeter due to his working on the flight line, the placement of his barracks, and his entering and exiting the base as "insufficient" because, in part, "the herbicide agent presumption has not been extended to veterans who served at a[n] RTAFB." (R. at 8 (5-13)). However, the lack of a presumption does not relieve the Board from providing Appellant special consideration of herbicide exposure on a factual basis because of his service at a[n] RTAFB, and the Board should have conducted a facts-found determination of herbicide exposure. *Combee v. Brown*, 34 F.3d 1039, 1040 (Fed. Cir. 1994).

R. at 170-71.

In May 2020, the appellant submitted an affidavit reasserting that his duties brought him in close proximity to the perimeter of the Takhli RTAFB; he also noted his hooch had no windows and the shuttle bus he rode always had its windows down because the bus lacked air conditioning; he noted he believed his hooch's and bus's open windows exposed him to the "elements." R. at 158. The appellant also submitted additional photographs and maps of the base, R. at 189-96, excerpts from the CHECO Report, R. at 48-52, and the 1971 Army Field Manual 3-3 (Tactical Employment of Herbicides), R. at 98-119. The 1971 Army Field Manual 3-3 states that "foliage will become discolored or brown . . . within 1 week after being sprayed by [Agent] ORANGE," and describes ground dissemination systems that include spraying the herbicide from trucks. R. at 105, 112-13. The manual further provides that "[a] 500-meter buffer distance should be maintained to avoid damage to desirable vegetation near the target, was expected to drift up to 500 meters after being sprayed." R. at 105, 112-13.

In June 2020, the Board denied the appellant's claim for diabetes. R. at 5-19. First, the Board acknowledged that herbicide exposure may be established for veterans that were stationed at an RTAFB and that "served as an Air Force security policeman, security patrol dog handler, member of the security police squadron, or otherwise served near the air base perimeter as shown by evidence of daily work duties, performance reports, or other credible evidence." R. at 7.

The Board noted that the appellant had reported multiple dates of onset for his diabetes and thus the appellant's own memory regarding when he was diagnosed with diabetes was of limited probative value. R. at 8. The Board further impugned the appellant's credibility, finding that appellant was inconsistent when he reported that while serving in Thailand he worked both 10- and 12-hours shifts. R. at 12. The Board ultimately discounted the appellant's lay testimony regarding his proximity to the base perimeter and exposure to herbicides:

> Considering the passage of time since his service at a RTAFB, the Board finds the Veteran's memory of activities that places him near the perimeter to be too tenuous to be persuasive. As noted earlier, the Veteran's memory concerning more recent dates and events is shown to be less than consistent. This would be all the more so for events and activities from 50 years ago.
>
> The January 2020 JMR noted that all personal accounts of being near the perimeter at the RTAFB would necessarily have taken place more than 45 years ago. However, this fact supports rather than goes against finding that a veteran's tenuous memory alone, without corroborative objective evidence, would be insufficient to

28

demonstrate sufficient proximity to the base perimeter or exposure to herbicides during service at a RTAFB. While it is true that personal accounts would have taken place more than 45 years ago, such fact does not convert those accounts into more probative evidence or mean that the passage of time cannot or should not be considered in weighing the value of the accounts.

R. at 14.

While the Board acknowledged the appellant's own statements and the buddy statements regarding his living quarters, work on the flight line, living quarters, and work near defoliated areas, the Board nonetheless found that "the preponderance of the evidence is against finding that the Veteran's daily work activities placed him near the perimeter or that the Veteran was exposed to herbicide agents during his active service." R. at 10-11. The Board used reasoning similar to that from its April 2019 decision, finding that

> based on [the appellant's explanation of working on a flight line], everyone who worked on the flight line would have been exposed to herbicide agents. This view would create a line of reasoning that is not supported by VA law. The herbicide agent presumption has not been extended to veterans who served on the flight line at RTAFB[.]

R. at 11. The Board continued:

> Similarly, the Board finds that the Veteran's explanations of being near the perimeter due to the placement of his living quarters (hooches), visiting the MARS shortwave radio station once or twice a month, or entering and exiting the base are insufficient to establish that the Veteran was exposed to herbicide agents. If these explanations were true, everyone assigned to these hooches, visiting the MARS shortwave radio station, or entering and exiting the base would have been exposed to herbicide agents, even if they only visited such areas once in a long while. Again, this view would create a slippery slope of line of reasoning that is not supported by VA law. The herbicide agent presumption of service connection has not been extended to all veterans who served at a RTAFB in Thailand. Exposure must be shown by at least an equipoise of the evidence standard. The statements provided by the Veteran do not establish, to an equipoise standard of evidence or greater, that he was exposed to Agent Orange while serving at the RTAFB in Thailand.

*Id.*

The Board also found that the appellant's statements that he saw trucks spraying a fog-like substance that he asserted was Agent Orange were "mere speculation." R. at 11-12. The Board rejected the buddy statements citing brown grassy areas because the fellow soldier "never states that he witnessed the vegetation being killed or sprayed on, and he provided no objective evidence for this assertion. The question of whether the brown grass around the flight line was caused by

29

chemical agents . . . requires specialized knowledge." R. at 13. The Board also rejected the various photographs and maps the appellant submitted because they did not demonstrate that the appellant's "regular activities or duties placed him at or near the perimeter." *Id*. The Board concluded that

> although the Veteran is shown to have served in Thailand in 1969 and 1970 and herbicide agent usage on the perimeters of Royal Thai Air Force Bases has been conceded, the preponderance of the evidence is against finding that the Veteran was a security policeman, a member of the security police squadron, or a security patrol dog handler during his period of service. Moreover, the preponderance of the evidence is against finding that his regular work duties placed him near to the perimeter of Takhli RTAFB or any other RTFB during his period of active service. The preponderance of the evidence is also against finding that the Veteran was exposed to herbicides during his active service at Takhli RTAFB.

*Id*. No definition of "near the air base perimeter" was provided. This appeal followed.


IV.

The appellant, in his brief, initially argued that the Board clearly erred in finding that the appellant did not serve near the perimeter. Appellant's Brief at 9-21. He began by noting that the Board had adopted the language of the M21-1 provision pertaining to concessions of herbicide exposure in Thailand verbatim, and that this provision allowed for the submission of "other credible evidence" to support a finding of herbicide exposure on a conceded basis. Appellant's Br. at 9 (citing M21-1, pt. IV, subpt. ii, ch. 1, § H.4.b). Because the Board informed the appellant that the M21-1 standard would govern its decision, the appellant contended that the Board was bound by the manual provision, even though VA's adjudication manual is not generally binding on the Board. *Id*. The appellant continued that the Board erred in finding no herbicide exposure on a facts-found basis because there was no presumption of herbicide exposure for Thailand veterans. Appellant's Brief at 11 (citing *Combee v. Brown*, 34 F.3d 1039, 1040 (Fed. Cir. 1994)). Additionally, the appellant contended that the Board erred in failing to concede herbicide exposure simply because his service personnel records did not establish that his duties occurred near the perimeter. Appellant's Brief at 13-14. Rather, the manual provision allows for "other credible evidence" to support a finding that a claimant served "otherwise near the perimeter," and the

30

appellant's own lay testimony,[144] his buddy statements, photographs, and other uncontroverted evidence submitted was sufficient to establish that he did serve near the perimeter of Takhli RTAFB. Appellant's Brief at 14-21.

The Secretary, in his brief, argued that the Board properly declined to extend the special consideration in the M21-1 for certain Thailand veterans to the appellant, where the Board plausibly found that the appellant's work duties did not place him near the perimeter of the Takhli RTAFB. Secretary's Brief at 9. The Secretary stated:

> The Board's reasoning was consistent with the language and intent of the Manual provision. That provision provides that the "special consideration" applies to Veterans whose "duties placed them on or near the perimeters of Thailand military bases." M21-1, IV, ii, 1, H, 4, a (emphasis added). Though the Manual does not define what it means to be "near" the perimeter, it *must mean something closer* than being on the flight line or housed in certain living quarters, or else virtually everybody who served on these air bases would have served "near" the perimeter. But Compensation Service extended the "special consideration" to only those whose duties placed them near the perimeter. If Compensation Service intended to extend the special consideration to those who regularly worked on or near the flight line or lived in certain quarters, it would not have limited the examples to other types of occupational specialties.

*Id.* (emphasis added). The Secretary then responded to the appellant's arguments and added that "[e]ven assuming the Court finds any error in the Board's application of the M21-1, the Court should still affirm the Board's decision because the Thailand M21-1 provision is non-binding authority that creates no judicially enforceable rights." *Id.* at 24.

After briefing, the Court ordered the Secretary to respond to 18 questions about VA's policy on herbicide exposure in Thailand. *See* November 2, 2021, Court Order. The Court asked the Secretary to define "on" as it appears in the M21-1. The Secretary responded:

> The introductory portion of the Thailand M21 provision refers to those who served "on or near" the perimeters. But the next portion, which includes the specific instructions for Veterans Benefits Administration (VBA) adjudicators, identifies those who served as security personnel or "otherwise near the base perimeter," without referencing those who served "on" the perimeter. "When assessing the meaning of a regulation, words should not be read in isolation but rather in the context of the regulatory structure and scheme." *Huerta v. McDonough*, 34 Vet.App. 76, 79-80 (2021). Because the specific instructions refer only to those who served "near" the perimeters, and because the introductory paragraph confirms

---

[144] The appellant also argued that the Board erred in discounting the credibility of the appellant's lay testimony regarding his service near the perimeter. Appellant's Br. at 14-17. The Court will address this argument below.

that the provision is intended to cover those who served "on or near" the perimeters, the most natural reading of the M21 provision, in its entirely, is that the words "on" and "near" are synonymous.

Response to Nov. 2, 2021, Order at 3. The Secretary cited the three listed MOSs in the manual provision as evidence to support his definition, contending that the definition of "security" added meaning to the phrase "otherwise near the perimeter." *Id.* at 5-6. The Secretary argued that

> [b]ased on the plain meaning of the terms "security" and the terms used to define that term ("patrol" and "inspect"), the security personnel identified in the M21 would have regularly, repeatedly, and carefully examined the base-perimeter structures for breaches, which would require close contact with those structures. Thus, the best reading of the word "near," when read in the context in which it is used in the M21, *means close enough to physically touch the perimeter structure.*

*Id.* at 6 (emphasis added).

The Court also asked the Secretary to provide the scientific basis for VA's policy for herbicide exposure. Nov. 2, 2021, Order at 3. The Secretary responded that when the Agency announced its policy in 2009, it referred to (1) the CHECO Report; (2) Buckingham WA (1982): The Air Force and Herbicides in Southeast Asia, 1961-1971, Office of Air Force History, United States Air Force, Washington DC; (3) Cecil PF (1986): Herbicide Warfare–The RANCH HAND Project in Vietnam, Vietnam, Praeger Special Studies, Praeger Scientific, New York NY; and (4) Cecil PF, Young AL (2008): Operation FLYSWATTER: A War Within A War, Env Sci Pollut Res 15(1): 3-7. Response to Nov. 2, 2021, Order at 13, 14, App'x at 5. The Secretary admitted that

> additional information concerning VBA's current policy may not exist. This policy was announced in a VBA Fast Letter in 2009; it is not found in any regulation. If the policy were found in an agency regulation, the Secretary would have developed a significant record for that rulemaking. For example, under Executive Order 12866, the agency would have been required to base its decision on the "best obtaining scientific . . . information concerning the need for, and consequences of, the intended regulation." Exec. Order No. 12866, § 1(b)(7). If "economically significant," the agency would have been required to conduct a regulatory analysis Exec. Order 12866, § 3(f)(1). The Secretary would have compiled a record of that information in the event of a direct challenge to that rule in the Federal Circuit under 38 U.S.C. § 502. But the current policy, which was announced in a letter from the Director of Compensation to VA ROs in 2009, rather than in a binding regulation, was not developed with those mandates in mind.

*Id.* at 15-16.

At oral argument, the appellant contended that the Court cannot review the Board's determination of whether buildings or the veteran were near the perimeter because the Board did not define "near," nor did the Board find how close the buildings or the veteran were to the perimeter. *See* O.A. at 14:25-15:07. In order to define "near," the Court needs to consider the totality of the circumstances and the totality of the veteran's service to determine where he was at the base. *See* O.A. at 15:55-16:50. The appellant argued that the Court should apply the ordinary meaning of "on or near" that the M21-1 employs, and not the Secretary's definition of "near," meaning "close enough to physically touch the perimeter structure." *See* O.A. at 2:50-3:18. The appellant argued that the Secretary's proposed definition is arbitrary, overly restrictive, and makes little sense when viewed in the context of the M21-1 in general. *See id.* When asked about his experience with cases involving Thailand herbicide exposure, the appellant's counsel noted that he has been involved in many cases involving Thailand herbicide exposure, and that VA had never taken the position it was taking here, i.e., in no other case before the Court had VA ever asserted that "near" means close enough to physically touch the perimeter fence. *See* O.A. at 5:05-:15. The appellant argued that the Court owes no deference to the Secretary's proposed definition of "near," because it is being advanced only as a litigation position and does not make sense in the context of the M-21. *See* O.A. at 15:55-16:50. The appellant asserted that deference should be afforded to the Secretary only when an issue requires his expertise, and defining "at or near" does not require expertise. *See id.*

At oral argument the appellant requested the following relief from the Court: (1) That the Court instruct the Board to apply the M21-1 provisions concerning Thailand herbicide exposure to Mr. Stover's case; (2) that the Court instruct the Board that it cannot use the Secretary's overly restrictive definition of "at or near"; and (3) that the Court readjudicate the case based on all credible evidence concerning the veteran's physical location at the base. *See* O.A. at 5:20-:55. Appellant's counsel conceded that the appellant had initially asked the Court to reverse the Board decision, but the appellant now believed that a remand is the appropriate remedy because the Board did not make an initial finding in the first instance in which the Board applied the correct standard and considered all the evidence. *Id.*

The Secretary responded, reiterating the position set forth in his brief, that the Board decision should be affirmed because (1) the Board correctly applied the Thailand herbicide policy found in the M21-1; and, alternatively, (2) if the Board misapplied the M21-1, it does not matter

33

because the M21-1 is a nonbinding policy that does not create a judicially enforceable right. *See* O.A. at 17:05-:35. The Secretary argued that his proposed definition that "near" means the veteran had to have been be close enough to the physical structure of the perimeter fence to actually touch it, is valid, because (1) the definition is limited to this one area and not to other parts of the base; (2) the M21-1 provides examples of other MOSs that are limited to security personnel who would have regular contact with the perimeter fence; and (3) a May 2009 memorandum from the director of the Compensation Service explained that the MOSs listed were listed because they were known to involve regular contact with the base perimeter. *See* O.A. at 17:40-18:50. The M21-1 policy, the Secretary argued, is, therefore, only meant to cover those individuals with regular, close contact with the base perimeter. *See* O.A. at 18:50-19:40. The Secretary noted that the M21-1 policy explains just one avenue that establishes in-service herbicide exposure, i.e., military duties placing the servicemember at the perimeter fence. *Id.* The Secretary contended that establishing having had such military duties is not the only way to establish herbicide exposure; a claimant may still establish actual exposure on a facts-found basis. *See id.*

Alternatively, the Secretary contended at oral argument that the M21-1 is not a legal instrument that creates an enforceable legal right for veterans. Rather, it is a nonbinding policy statement that has not gone through the notice-and-comment process that would enable it to be published in the *Federal Register*. *See* O.A. at 19:40-20:25. While the manual binds frontline adjudicators at the RO, *see* 38 C.F.R. § 20.05, it is clear that the M21-1 is mere guidance for Board determinations. *See* O.A. at 22:50-23:10, 31:20-32:00.

V.

I agree with the majority that the M21-1 is the law controlling the appellant's case, but for a different reason. The majority is correct that the Board adopted the M21-1 provision related to conceded herbicide exposure for Thailand veterans. *See* R. at 7. The majority's application of *Andrews* ignores a very obvious problem: If the M21-1 provision regarding herbicide exposure in Thailand is not binding on the Board in every case, the Board will be practicing the so-called forbidden "goalpost-moving" *every time* it chooses not to apply the provision. The actual quote the *Andrews* Court adopted from *Hudick* is the following: "It cannot be that the *VA* [not merely the Board] may tell a veteran how to establish a service connection for his [condition] only to move the goalposts once he has done so. This kind of goalpost-moving does not reflect an optimal mode

of administrative decisionmaking." *Hudick v. Wilkie*, 755 F. App'x 998, 1007 (Fed. Cir. 2018) (emphasis added). When the issue of herbicide exposure in Thailand is adjudicated at the RO level, there is no question that the M21-1 will be the law of the case. *Any* deviation from the M21-1 provision at the Board level will result in the Thailand veteran having no knowledge of how to establish exposure to herbicides in Thailand once a claim has been denied by the RO. This problem is compounded by the fact that the M21-1 is the only place where VA has provided a policy regarding these worthy veterans. I would have held that the Thailand herbicide provision of the M21-1 is binding on the Board so that a claimant is subject to the same law throughout the pendency of his claim.

VI.

I agree with the majority's finding that the failure to define "near the perimeter" and the Board's "slippery slope" analysis essentially foreclosed the appellant's ability to establish that he served "otherwise near the perimeter of the air base." These portions of the majority decision perfectly explain the Board error.

Merely defining "near the air base perimeter" is not enough. VA must also adequately explain how it reached the definition. Without an adequate explanation for the definition, VA's application of the Thailand exposure provision or denial of a concession of herbicide exposure would still be arbitrary. This is not a straightforward task. The word "near" is a relative term that carries no meaning without context.

I would have held that the uncontroverted evidence submitted by the appellant was sufficient to establish that he had served "near the perimeter" under any reasonable definition of the that term. It should be enough, to establish a concession of exposure, that a claimant submits corroborating evidence, as the appellant did here, to support his contention that he served near the perimeter. More than 50 years have passed since these veterans were subject to herbicide exposure in Thailand. VA has had more than a decade to clarify its policy surrounding alleged herbicide exposure and has not done so. Five years have passed since VA supposedly initiated formal notice-and-comment rulemaking. And now, the Secretary appears to have changed his definition of the term "near the perimeter" during this litigation. If there was ever a time for this Court to define a term created by VA, this was it.

VII.

Even if the Court refused to provide its own definition of the term "near," far more guidance should have been given to VA and claimants. VA adjudicators will have no idea how to define the term "near the perimeter" moving forward or what will be an acceptable explanation for a chosen definition. A claimant will be even worse off than before this decision because he will not only have no concept of how close to the perimeter he has to have been to establish a concession of herbicide exposure, but also it is possible that he must now prove that he was close enough to touch the fence as long as VA can establish that throughout the pendency of the claim, it always believed "near" and "on" were synonyms.

At the very least, the Court should have required that any definition of "near the perimeter" be consistent with the CHECO Report. When VA's C&P Service announced the herbicide-exposure-in-Thailand policy in May 2010, the C&P Service solely cited the CHECO Report for the finding that herbicides had been used within the perimeters of the Air Force bases. In addressing base-perimeter security measures, Major Barnette found that "[t]o further aid in observation, herbicides were employed to assist in the difficult task of vegetation control." R. at 49. He specifically discussed application at Nakhon Phanom RTAFB, to explain how herbicides were used generally within Thailand Air Force bases to clear vegetation. Barnette noted:

> The extent to which vegetation has been cleared is graphically illustrated in the case of [Nakhon Phanom RTAFB]. The photograph of that base on the following map shows the extent of vegetation *inside* the base perimeters in the early days of construction when the airfield was carved out of virgin jungle. An interesting comparison between [Nakhon Phanom RTAFB] 1966 and [Nakhon Phanom RTAFB] 1972 can be made by reference to the picture of that base that appears earlier in this report.

*Id*. (emphasis added).

Although this evidence obviously refers to a base different from Takhli, VA makes no distinction between bases in its policy. *See* M21-1, VIII.i.1.A.4.b (equally treating all airmen who served at U-Tapao, Ubon, Nakhon Phanom, Udorn, Takhli, Korat, and Don Muang RTAFBs). Because this evidence appears to show how and where herbicides were used within the perimeters, it is unclear why the Board did not address this evidence when it found that the appellant did not serve near the perimeter; it appears that this evidence may be informative in defining the term "near the air base perimeter," particularly because VA's C&P service expressly relied on the CHECO Report to conclude that "there was significant use of herbicides on the fenced in

perimeters of military bases in Thailand intended to eliminate vegetation and ground cover for security bases." R. at 30. In defining the term "near the air base perimeter" on remand, the Court should have held that Board must choose a definition that is consistent with the evidence VA relied on to adopt its policy or adequately explain any deviation. *See id.*; *see also* 38 U.S.C. § 7104(d)(1). The Court has the power to provide this guidance now and failing to do so will only force the Court to address this issue again at a later date when even more Thailand veterans have died without receiving the disability benefits they are entitled to.

## VIII.

I also write separately to note that, even if a claimant is unable to establish that his duties brought him "near the perimeter," VA must still perform an actual-exposure analysis. Otherwise, Thailand veterans would be in a worse position than any other claimant trying to establish herbicide exposure without a presumption. In order for VA to concede exposure to herbicides, a claimant must establish that his duties placed him "near the base perimeter" on a regular basis. *See* M21-1, VIII.i.1.A.4.b. On the contrary, a claimant looking to establish actual exposure to herbicides should only have to establish that it is as least as likely as not that he was exposed to herbicides *once* during his service. While a concession-of-herbicide-exposure analysis solely considers the frequency at which regular duties brought a claimant within a certain distance of the perimeter, VA should also have to perform an actual-exposure analysis that considers the totality of the circumstances of a claimant's service in Thailand, including not only evidence pertaining to a claimant's regular duties, but also where the claimant lived in relation to the perimeter, how large the base was, how often claimants approached the perimeter off duty, science-based or military-provided evidence discussing the role wind and rain play in moving herbicides away from their targeted area, particularly during seasonal monsoons, and any other competent and credible evidence that helps establish that it is at least as likely as not that a claimant was exposed to herbicides—at least one time. *See* 38 U.S.C. § 5107(b). Here, the Board did not perform that analysis and the majority opinion's silence regarding this failure appears to suggest that an actual exposure analysis was not required.

I agree with William Paterson that "[j]udges may die, and courts be at an end; but justice still lives, and, though she may sleep for a while, will eventually awake, and must be satisfied."

*Penhallow v. Doane's Adm'r*, 3 U.S. 54, 79 (1795) (Paterson, J). The just result for veteran Stover, and all Thailand veterans, still sleeps.